RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0444p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-2279

DANIEL LEE STUART,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80439—George C. Steeh, District Judge.

Argued: October 23, 2007

Decided and Filed: November 7, 2007

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Liisa R. Speaker, SPEAKER LAW FIRM, PLLC, Lansing, Michigan, for Appellant.
Kevin M. Mulcahy, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** Liisa R. Speaker, SPEAKER LAW FIRM, PLLC, Lansing, Michigan, Ina R. O'Briant,
East Lansing, Michigan, for Appellant. Kevin Mulcahy, ASSISTANT UNITED STATES
ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. A jury convicted Daniel Lee Stuart of violating several drug-trafficking and firearm-possession laws. On appeal, Stuart argues that his rights to effective assistance of counsel, a trial by jury, a *Franks* hearing and due process were violated. Because we decline to review Stuart's ineffective assistance claim on direct appeal and because his other arguments are unconvincing, we affirm.

I.

On March 25, 2003, a Michigan police officer stopped Richard Hale for speeding, discovered a gallon-sized bag of marijuana in his car and arrested him. Soon after the arrest, Hale spoke with Officer Lou Costley, a member of the Jackson Narcotics Enforcement Team. As a three-time prior offender, Hale knew that another conviction could mandate a life sentence, and as a result he cooperated with the police in order to "save [his] own freedom." JA 277. Hale told Costley that he

had purchased the seized marijuana from Daniel Stuart, that he had purchased marijuana from Stuart on a regular basis and that he had seen an additional ten pounds of marijuana in Stuart's residence.

Costley sought a warrant to search Stuart's residence. In the affidavit accompanying the warrant application, he described the facts surrounding the traffic stop and Hale's incriminating statements about Stuart. Costley added that Stuart previously had been investigated for marijuana possession. A judge approved the warrant that same day—March 25th. When the narcotics team searched Stuart's house, they seized roughly four pounds of marijuana, two digital scales, body armor and a small arsenal of firearms that included a revolving cylinder shotgun (a "street sweeper"), two assault rifles and five other shotguns or rifles.

A federal indictment charged Stuart with (1) possession of marijuana with intent to distribute, *see* 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A); (3) maintenance of drug-involved premises, *see* 21 U.S.C. § 856(a)(1); (4) possession of an unregistered firearm, *see* 26 U.S.C. § 5861(d); and (5) possession of a firearm by an illegal drug user, *see* 18 U.S.C. § 922(g)(3).

Stuart sought to suppress the evidence against him based on an alleged discrepancy between the date of the search and the date of the warrant. Relying on a difference between the date of the warrant (March 25, 2003, JA 57) and the date of the incident report (which bore a "Date & Time" of March 23, 2003, JA 60), Stuart argued that the warrant "was issued [two] days after the actual search took place." JA 57. Claiming that a "major conspiracy" was afoot, JA 170, Stuart accused government officials of forging documents in order to cover up the fact that the search occurred before the officers had a warrant. As evidence, Stuart offered to submit an affidavit of Mary Jo Marr—his girlfriend—stating that the search occurred on Sunday, March 23. The police, he added, orchestrated this conspiracy to get Stuart "off the street" because "he had a lot of incriminating evidence about" various officers' "drug trafficking in Jackson." JA 191. In response, the government explained that the discrepancy over the date of the search stemmed from a computer mistake and provided several documents—five officer activity logs, a towing report, a condemnation document, dispatch logs, canine search documentation, fingerprint records and a booking report—showing that the search occurred on Tuesday, March 25.

After listening to all of this, the court determined that it did not need "to hear testimony in order to resolve the motion based on the credibility of the competing versions," because "the theory of the movant in this case is so bizarre, it has to be beyond belief." JA 188. The court also told the defense that "unless you [are] able to produce something more than that close friend of the defendant's who says that she remembers that it was the 23rd that he was arrested . . . I don't believe that you have created a sufficient question of fact concerning that issue . . . . If in the meantime you developed some more compelling evidence . . . then I will certainly entertain that." JA 189–90.

Nearly one month later, the court granted Charles Fleck's motion to withdraw as defense counsel and permitted Stuart, with new counsel, to file an additional motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the truthfulness of Costley's statements in the underlying search-warrant affidavit. Stuart attached an affidavit of Terrance Wheeler, who said that Costley previously had offered him "immediate release from detainment with no further actions . . . if [he] would say that [he] had purchased marijuana from Daniel Stuart." JA 98. The court denied the motion, finding probable cause and noting that Wheeler's affidavit did nothing to establish that Costley asked Wheeler "falsely or recklessly [to] implicate" Stuart. JA 32.

At a separate pretrial hearing, the government told the court that Stuart had listed two witnesses, Anthony Marr and Mary Jo Marr, who might testify about the date of the search in a manner that "contradict[s] what the police officers testified to . . . and what other witnesses testify to." JA 211. The government told the court that the witnesses "should be advised they need to seek

counsel because they may be setting themselves up for jeopardy." *Id.* The court declined to give such a caution "given the chilling effect that such a warning might have for them to testify." JA 212.

At the end of the prosecution's case, Stuart proposed this jury instruction: "In order to return a guilty verdict, all twelve of you must agree that the defendant committed the crime on the same date, either March 23, 2003 or March 25, 2003." JA 157. The court refused to submit the instruction because "the validity of the warrant and the search . . . [is a] question for the Court to decide." JA 350.

## II.

Stuart raises four arguments on appeal: (1) his original counsel was ineffective in failing to investigate his theory about the date of the search; (2) the court violated his Fifth and Sixth Amendment rights when it refused to submit the dispute over the date of the search to the jury; (3) the court improperly denied him a *Franks* hearing; and (4) the court violated his due process right to present his theory of the case when the prosecution intimidated his witnesses with perjury threats.

## A.

"As a general rule, this Court will not review claims of ineffective assistance of counsel for the first time on direct appeal [unless] the record is adequately developed . . . ." *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000). Stuart offers no good reason for departing from this general rule here, and accordingly Stuart must pursue these claims, if he pursues them at all, through a motion under 28 U.S.C. § 2255.

## B.

Stuart next argues that the court violated his rights under the Fifth and Sixth Amendments when it refused to submit the dispute over the date of the search to a jury. The court should have adopted his proposed jury instruction, he says, because the timing of the search was a factual question and because "questions of fact[] are to be determined by the jury and matters of law are properly determined by the court." Br. at 10.

Even if we accept Stuart's argument that he presented enough evidence to create a legitimate factual dispute over the date of the search, that does not make the question one for the jury. The application of the exclusionary rule generally presents "question[s] of fact and law for the court and not for the jury." *Steele v. United States*, 267 U.S. 505, 511 (1925) (holding that a probable-cause determination need not be submitted to a jury). As with most evidentiary rulings, *see* Fed. R. Evid. 104(a); *United States v. Nickerson*, 606 F.2d 156, 158 (6th Cir. 1979), courts rather than juries must ultimately decide whether a Fourth Amendment claim requires the suppression of evidence, *see Steele*, 267 U.S. at 511; *United States v. Lang*, 8 F.3d 268, 271 (5th Cir. 1993) (reversing based upon the court's failure to determine conclusively whether cocaine was in plain view).

Stuart responds that he wanted the jury to determine a factual question at the "heart of . . . [his] constitutional rights," not the admissibility of evidence. Reply Br. at 1. But the date of the search was relevant *only* to the propriety of applying the exclusionary rule, not for any other reason. Once the court upheld the validity of the search, all that was left for the jury to decide was whether the government proved the elements of the charges beyond a reasonable doubt. None of the charged crimes required the jury to agree upon the date of the search or even the date that the crime occurred. The jurors needed to agree only that, as charged in the indictment, "[o]n *or about* March 25, 2003," Stuart possessed the marijuana with the requisite distributive intent, possessed the relevant guns and maintained a drug-involved premises. JA 17–19 (emphasis added).

Stuart says that *Haynes v. Washington*, 373 U.S. 503 (1963), is to the contrary, and that it requires all factual questions bearing on constitutional issues to go to the jury. That is not true. A jury determination of a factual issue "may be entitled to some weight" in some circumstances, *Haynes* acknowledged, *id.* at 515, but it never said that a defendant's right to a jury trial requires all factual questions bearing on the validity of a search to go to a jury. At stake in *Haynes* was not the validity of a search but the validity of admitting an involuntary confession at trial. *Id.* at 514–15. After the Court determined that "the bounds of due process ha[d] been exceeded" by the admission of the involuntary confession, it rejected the State's argument that this conclusion was "foreclosed" because the "jury may have reached a different result on this issue," *id.* at 515, when it was asked to decide the voluntariness of the confession under a later-abandoned state-law procedure that treated the issue as one of fact, *id.* at 506–07 & n.5. In reaching this conclusion, *Haynes* observed that the courts "cannot be precluded by the verdict of a jury from determining" the ultimate constitutional question. *Id.* at 515–16. *Haynes*, in short, is a case that identified due process problems with submitting the constitutionality of a confession to a jury, not with submitting it to a judge.

Any doubt about the meaning of *Haynes* was put to rest one year later by *Jackson v. Denno*, 378 U.S. 368 (1964), which invalidated a New York procedure that sent the voluntariness of a confession to the jury unless "in no circumstances could the confession be deemed voluntary." *Id.* at 377. The Court rejected this procedure because of the "danger that matters pertaining to the defendant's guilt will infect the jury's findings of fact bearing on voluntariness." *Id.* at 383. Far from requiring juries to decide such questions, the Court held that trial judges must make a "clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." *Id.* at 391. Whether *Haynes* and *Jackson* still allow a jury to consider factual issues bearing on constitutional questions after the judge has ruled on the question is a matter we need not decide; for present purposes, it suffices to say that the two cases do not require courts to allow juries to second guess those decisions or decide them in the first instance.

It is worth emphasizing the reach of Stuart's rule: He is not saying that courts *may* present juries with factual questions bearing on the constitutional admissibility of evidence obtained during a criminal investigation; he is saying that they *must* do so. Not only does that position lack a single precedent to support it, but it also would transform criminal trials. Courts hoping to follow this rule would face a series of awkward choices in deciding how to comply with it. They could hold a jury trial before the (real) jury trial to determine what evidence would be admissible against the defendant. Or they could submit the constitutional evidentiary issues to the same jury that decides guilt or innocence. The former response would compel two criminal trials in the place of one and frequently would require witnesses to testify on two different occasions. And the latter would preclude the parties (including the defendant) from knowing what evidence would be admissible until after each party had closed its evidence and the case had gone to the jury—a cure that surely makes the disease worth living with.

It gets worse. Any hope of complying with Stuart's jury-instruction method in a single proceeding—the remedy Stuart seems to prefer—would require the jury to determine the evidence it was allowed to consider *after* it heard the evidence it might or might not be allowed to consider. In any trial in which the jury found the defendant guilty after resolving the constitutional fact dispute in the defendant's favor, the court would face serious cause for a mistrial. *Cf. Haynes*, 373 U.S. at 518–19 (remanding the case "for a jury to decide on a new trial free of constitutional infirmity"); *Jackson*, 378 U.S. at 388 (noting that, once admitted, evidence becomes "solidly implanted in the jury's mind"). In the final analysis, Stuart's rule has no more precedential support than it does common-sense support, and accordingly we reject the argument.

C.

In contending that the district court should have granted a *Franks* hearing, Stuart fails to come to grips with the fact that he did not make a threshold showing that the warrant affidavit contained deliberately or recklessly false information. *Franks* no doubt gives defendants the right to challenge the propriety of a previously issued warrant. But "[i]n order to obtain a hearing, the defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). Warrant affidavits carry with them "a presumption of validity," and "the challenger's attack must be more than conclusory" and must allege "deliberate falsity or reckless disregard [on the part] *of the affiant*, not of any nongovernmental informant." *Franks*, 438 U.S. at 171 (emphasis added).

In addressing this issue, we need not take sides on the division in the courts of appeals over whether a district court's *Franks* ruling receives clear error or de novo review. *See Stewart*, 306 F.3d at 304. In *Stewart*, we identified the conflict in the courts but determined that "the more exacting [*de novo*] standard of review is satisfied . . . and it is unnecessary for us to further discuss the issue." *Id.* (internal quotation marks omitted and alterations in original). We take the same path here. Stuart has made no showing that any of the information in the affidavit was deliberately false or submitted with reckless disregard for its truth, and as a result his claim cannot satisfy either standard.

In his warrant affidavit, Costley described his expertise in narcotics trafficking, his knowledge of previous narcotics investigations involving Stuart, the details behind Hale's arrest and Hale's statements about Stuart's drug dealing. Stuart has done nothing to show that Costley—the affiant—made any deliberately false or reckless claims in the affidavit. Each of Hale's allegations was set forth with the qualifier, "Your Affiant was informed by Hale . . . ." JA 86–89. Stuart points only to evidence that one of Hale's statements to the police may have been misleading, and he has provided no evidence that the statements were not true, let alone that Hale never made them to Costley. Although Hale equivocated at trial regarding whether he actually saw ten pounds of marijuana, he confirmed that he did indeed tell the police he saw "seven to ten" additional pounds. JA 282. Stuart thus has not established a cognizable claim of falsity "of the affiant," as *Franks* requires. 438 U.S. at 171.

Stuart alternatively argues that Costley recklessly credited Hale's statements because Hale snitched in order to "save [his] own freedom." JA 277. An arrested informant in Hale's position, it is true, may have "a motivation to implicate and pass the blame to another," *Hill v. Hofbauer*, 337 F.3d 706, 717 (6th Cir. 2003), and the use of such statements *at trial* may pose hearsay problems when offered by the non-declarant, *see United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004). But Stuart is wrong to suggest that an officer may never rely on post-arrest statements in investigating a crime or in seeking a warrant. Although *Trujillo* held that the arrested declarants in that case had "a motive to lie, regarding the source of the marijuana, in order to get lenient treatment" and thus their earlier statements could not be admitted under the hearsay exception for prior consistent statements, *see* Fed. R. Evid. 801(d)(1)(B); *Trujillo*, 376 F.3d at 611, it also held that the presence of the same post-arrest statements in a search-warrant affidavit did not establish "a strong showing" of falsity sufficient to require a *Franks* hearing, *id.* at 604.

In this case, Officer Costley used Hale's post-arrest statements to support a warrant application. Hale knew that he faced a potential life sentence as a fourth-time offender, and Costley could fairly use his statements on the theory that Hale would not aid his cause by leading the police down a false trail. On this record, Costley was not unduly reckless when he included Hale's statements in the affidavit, especially since Hale merely identified his source for the marijuana and did not attempt to shift blame away from himself or excuse his own possession.

The last piece of evidence offered to impugn the affidavit's reliability was Terrance Wheeler's sworn statement that Costley previously tried to elicit testimony from him incriminating Stuart. But if Stuart was a suspect, why wouldn't Costley ask others for information about him? Thus, while Wheeler's affidavit offers the unremarkable fact that Costley asked him, as opposed to just Hale, for incriminating information about Stuart's drug dealing, it does not show that Costley pursued this lead recklessly or with any malicious intent, which is what is required to obtain a *Franks* hearing. *Stewart*, 306 F.3d at 304.

D.

Stuart finally objects that the prosecutor's references to perjury charges caused him and his witnesses Mary Jo Marr and Anthony Marr not to testify, thereby denying him due process. Defendants indeed have a due process right to present witnesses to establish a defense, *Washington v. Texas*, 388 U.S. 14, 19 (1967), and this right precludes prosecutors and judges from improperly threatening witnesses with perjury prosecution, *Webb v. Texas*, 409 U.S. 95, 97–98 (1972). "*Webb*, however, does not stand for the proposition that merely warning a witness of the consequences of perjury demands reversal." *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995). To the contrary, "the government has an obligation to warn unrepresented witnesses of [that] risk." *Id.* To establish a claim of witness intimidation, as a result, defendants must present "government conduct which amounts to substantial interference with a witness's free and unhampered determination to testify" and must prove that any inappropriate conduct was not harmless. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). Stuart has not met this burden.

Stuart claimed at sentencing that he would have testified but for the government's perjury threats, yet the record shows that no such threats occurred and that Stuart's decision not to testify was his own. The judge warned Stuart about the risks of testifying, including "the possibility that . . . obstruct[ing] justice . . . [c]ould add to his offense scores in the determination of his guideline range," but the court made clear that an enhanced sentence was a "more likely risk than perjury prosecution." JA 354. The judge did not "want to have the record indicate that [Stuart was] being openly threatened with perjury prosecution if he [took] the stand to testify," and the government agreed that it wanted Stuart to "make his own decision" and was "not threatening him with anything." JA 355–56.

"You understand," the court asked Stuart, "that the decision to testify or not to testify is entirely your own?" JA 358. And Stuart responded, "Yes, your[] Honor." *Id.* The prosecution again "want[ed] the record to reflect that we're not threatening the defendant with anything. His decision to testify is his own, and we have no stake in that case." JA 359. When Stuart expressed confusion, the court explained, "the only real potential risk that you would take on if you testify, and if it's concluded that you lied in your testimony . . . is that your sentence could be increased under the guideline calculation." *Id.* Stuart responded, "I understand," and reiterated his decision not to testify. JA 360. Where, as here, the government did not threaten Stuart with perjury and the court repeatedly told Stuart that the only material risk he ran was an enhanced sentence due to obstruction of justice, he cannot show that the court or the government improperly interfered with his decision to testify.

As to Anthony and Mary Jo Marr, neither the government nor the judge made *any* statements regarding perjury charges to them. At a plea-cutoff hearing, the government told the court that the witnesses "should be advised they need to seek counsel because they may be setting themselves up for jeopardy" by testifying that the date of the search was Sunday, March 23. JA 211. But this statement was intentionally made outside the presence of these witnesses in order to fulfill the prosecution's recognized "duty," JA 353, and the court declined to caution the witnesses "given the chilling effect that such a warning might have for them to testify," JA 212. Stuart's counsel even admitted that the prosecution never directly threatened these witnesses, stating that she herself

relayed that the government "would prosecute [them] for perjury." JA 353. On this record, as the district court correctly concluded, no misconduct occurred.

Even if there had been misconduct, it bears adding, it could not have affected the outcome of the trial. Keep in mind that these witnesses would have testified only about the date of the search—which, as we have explained, had no bearing on the question of guilt. The court considered their potential testimony at the suppression hearing and ruled the search constitutional. Stuart thus had nothing more to gain from their testimony at trial.

III.

For these reasons, we affirm.