RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VISHNU PRADEEP MEDA (13-2598); MEHRAN JAVIDAN (13-25990,

*Defendants-Appellants.*

Nos. 13-2598/2599

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20052—Denise Page Hood, District Judge.

Argued: October 6, 2015

Decided and Filed: December 23, 2015

Before: COLE, Chief Judge; DAUGHTREY and DONALD, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Brandy Y. Robinson, LEGAL AID & DEFENDER ASSN., INC., Detroit, Michigan, for Appellant in 13-2598. Jonathan I. Edelstein, LAW OFFICE OF ALAN ELLIS, New York, New York, for Appellant in 13-2599. Ross B. Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Brandy Y. Robinson, LEGAL AID & DEFENDER ASSN., INC., Detroit, Michigan, for Appellant in 13-2598. Jonathan I. Edelstein, LAW OFFICE OF ALAN ELLIS, New York, New York, for Appellant in 13-2599. Ross B. Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

------------------------

## OPINION

------------------------

BERNICE BOUIE DONALD, Circuit Judge.    This is a consolidated appeal.    Vishnu Pradeep Meda and Mehran Javidan were tried jointly and convicted on multiple charges arising from a Medicare scam.    On appeal, Vishnu Pradeep Meda argues that his conviction violated the Fifth Amendment's Double Jeopardy Clause and that he was subjected to prosecutorial vindictiveness for refusing to plead guilty and asserting his right to a jury trial in prior case. Mehran Javidan raises multiple issues for review.    However, each issue falls into one of the following categories:  (1) improper evidentiary rulings, or (2) sentence calculation errors.

For the reasons set forth below, we **AFFIRM** both convictions.

## I.  INTRODUCTION

Mehran Javidan ("Javidan") and Vishnu Pradeep Meda ("Meda") worked together at Acure Home Care ("Acure").    Javidan, as a part-owner, handled the daily operations.    Meda worked for Acure as a physical therapist.

In mid-2008, Javidan approached her friend Muhammed Shahab ("Shahab") for help entering the home-health business.    At that time, Shahab was involved with at least two fraudulent home-health agencies—Patient Choice and All American.[1]    Shahab allowed Javidan to shadow him, and it was during this time that she learned the fraudulent scheme that she would later duplicate.

In November 2008, Javidan, Shahab, and two other individuals purchased Acure. Javidan was a twenty-percent owner of Acure.    However, for all intents and purposes, she managed the business.    She signed Acure's Medicare application and maintained payroll.    She was also the only person with signature authority on Acure's bank account and, most importantly, was solely responsible for Acure's Medicare billing decisions.

------------------------

[1]On September 17, 2009, federal authorities executed a search warrant on Patient Choice and All American.  Subsequently, they were shut down.

Javidan illegally recruited patients to Acure two different ways.  First, she paid "kickbacks" to corrupt physicians in exchange for referrals.  Second, she hired "marketers" to recruit patients by offering Medicare beneficiaries cash or prescription medications in exchange for their Medicare numbers and signatures on various blank Medicare forms.  After obtaining the beneficiaries' information, Acure's employees completed the necessary documents and submitted fraudulent reimbursement forms to Medicare for services that were either unnecessary or never rendered.  Many of the recruited patients were not homebound and/or never received care.

Javidan hired Meda to be a physical therapist at Acure.  Meda participated in the fraud at Acure by signing revisit notes for patients that he did not visit.  He also told Javidan which patients were not homebound and which patients demanded money in exchange for their Medicare information.

The government filed a sealed indictment on February 3, 2011, charging Javidan and Meda with health care fraud conspiracy under 18 U.S.C. § 1347, and one count of conspiracy to receive kickbacks under 18 U.S.C. § 371.[2]  On November 29, 2012, the grand jury retuned an eleven count superseding indictment.

At trial, Javidan called four witnesses and testified herself.  She asserted that she did not participate in any fraudulent activity and that she was generally unaware of the fraudulent business practices at Acure.  Meda called no witnesses.  The jury found both Javidan and Meda guilty.[3]  Javidan and Meda were sentenced to terms of 65 and 46 months of imprisonment, respectively.  The pair timely appealed.

## II.  DOUBLE JEOPARDY

Meda contends that the government's prosecution of him in this case violated his right to be free from double jeopardy under the Fifth Amendment.  He argues that the Patient Choice/All American conspiracy and the Acure conspiracy were, in fact, one conspiracy.  If that were the case, once he was acquitted in the Patient Choice/All American case, the government was

---

[2]The indictment also charged a third individual, Ram Naresh Rajulapati.  He pled guilty before trial.

[3]Javidan was convicted on Counts 1,2,4,5,7,9, and 11.  Meda was convicted on Counts 1,2,4,7, and 9.

constitutionally estopped from indicting him in this case. Although a close call, for the reasons detailed below, we hold that the indictment in this case did not violate the Fifth Amendment's Double Jeopardy Clause.

## A. FACTS

In January 2010, the government charged Meda with conspiracy to commit health care fraud at Patient Choice and All American. The indictment alleged that the conspiracy lasted from August 2007 to September 2009. In that case, the government contended that Meda fraudulently completed Medicare documents that falsely indicated that he provided care. The government further alleged that those documents played a major role in Patient Choice and All American submitting approximately $14.5 million in fraudulent claims to Medicare. In October 2012, a jury acquitted Meda.

In November 2012, the government filed charges in this case against Meda alleging that he had continued his fraudulent Medicare practices at Acure. In many respects, the conduct alleged in the Acure indictment mirrored the conduct alleged in the Patient Choice/All American indictment. Meda moved to dismiss the indictment on double jeopardy grounds, arguing that the Acure and Patient Choice/All American conspiracies were, in fact, only one conspiracy. The district court denied Meda's motion.

## B. ANALYSIS

We review *de novo* the district court's denial of a motion to dismiss a conspiracy charge on double jeopardy grounds. *United States v. Wheeler*, 535 F.3d 446, 449 (6th Cir. 2008); *United States v. WRW Corp.*, 986 F.2d 138, 140 (6th Cir. 1993).

The Double Jeopardy Clause of the Fifth Amendment commands that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003). The Double Jeopardy Clause "serves principally as a restraint on courts and prosecutors." *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal." *Brown*, 432 U.S. at 165. "In a conspiracy case, it is the agreement which forms the nucleus of the offense." *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). "Therefore, a determination of whether the government can prosecute on more than one conspiracy rests on whether there exists more than one agreement." *Id.*

In conspiracy cases, we determine whether the government violated the Double Jeopardy Clause by analyzing the "totality of the circumstances" utilizing the following five factors:

(1)     the time period covered by the two alleged conspiracies;

(2)     the identity of the persons alleged to be coconspirators;

(3)     the statutory offenses charged in the indictments;

(4)     the overt acts charged by the government or any other description of the offenses

charged which indicates the nature and scope of the activity the government

sought to punish in each case; and

(5)     the places where the events alleged as part of the conspiracy took place.

*Id.* "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." *Id.* at 1256-57.

With respect to the first factor, the record illustrates that both alleged conspiracies took place during different time periods. The operative indictments indicate that the Patient Choice/All American conspiracy took place from August 2007 through September 2009, while the conspiracy in this case occurred between March 2009 through November 2010. Although there was an overlap of approximately six months, the time period in the Acure indictment did not completely subsume the Patient Care/All American indictment. Such a small overlap suggests that these were two distinct conspiracies. *See Sinito*, 723 F.2d at 1257 (stating that an overlap of ten months was not indicative of one conspiracy); *see also United States v. Inmon*, 594 F.2d 352, 354 (3d Cir. 1979) (opining that time frames and personnel can overlap in separate criminal agreements). Also tilting this factor in the government's favor is the fact that Meda

stopped receiving checks from Patient Choice and All American in September 2009, while he received his first check from Acure in August 2009, resulting in an overlap of only two months.

Turning to the identity of the coconspirators, we find that this factor also weighs in the government's favor. Under this factor, the relevant question is not whether the same persons were actually charged in each indictment, but rather whether the same persons were involved in the activities charged under each indictment, unindicted persons included. *Wheeler*, 535 F.3d at 451 (citing *United States v. DeCologero*, 364 F.3d 12, 19 (1st Cir. 2004)). In his brief, Meda correctly identified physicians and marketers who participated in both conspiracies. However, many of those individuals played minor roles in each conspiracy and were not "central characters" in either conspiracy. *See United States v. El-Mezain*, 664 F.3d 467, 547 (5th Cir. 2011) (stating that if the central figures are different, or serve different functions, it is less likely that there is a single agreement). Shahab was the central character in the Patient Choice/All American conspiracy, and Javidan was the central character in the Acure conspiracy, as she ran the day-to-day operations and made all the Medicare decisions. Unlike at Patient Choice and All American, Shahab was not actively involved in Acure's business. He was merely a part owner. Moreover, unlike Shahab, who played a passive role in the Acure conspiracy, Javidan played no role at all in the Patient Choice/All American conspiracy. Since the role played by the two central characters in each respective conspiracy was "quite different," in the case of Shahab, and non-existent, in the case of Javidan, we find that this factor narrowly weighs in the government's favor. *See id.*

The government correctly concedes that the offenses charged and the location of the conspiracies factors favor Meda. Meda was charged for the exact same offenses in both indictments. Both conspiracies took place in the same office building, albeit in separate suites. Accordingly, we agree with the government and find that the offenses charged and location of the conspiracies factors weigh in Meda's favor.

As to the overt acts charged by the government, we find that the government indicted different acts in each respective conspiracy. Meda argues that both conspiracies were "part of a larger, unified conspiracy." *See Sinito*, 723 F.2d at 1258. However, in the present case, the government indicted the Medicare fraud that took place at Acure, not Patient Choice and All

American.  Although the second indictment charged Meda with performing the same fraudulent acts in both cases, that does not change the fact that in the previous case the government attempted to stop Medicare fraud at Patient Choice and All American, and in the present case the government sought to stop the Medicare fraud at Acure.  Further illustrating this point is the fact that when Patient Choice and All American were shut down after federal authorities served a search warrant on their respective business premises, Acure continued to operate.

To conclude, two factors weigh in Meda's favor (location of the offenses and statutory offenses charged), and the remaining three factors weigh in the government's favor (time, persons acting as co-conspirators, and the overt acts charged).  The test calls for us to make a determination based on the totality of the circumstances utilizing the previously analyzed five factors.  Notwithstanding the two factors that weigh in Meda's favor, we are more persuaded by the three that support a finding that Meda's indictment in this case did not violate the Fifth Amendment's Double Jeopardy Clause.

### III.  PROSECUTORIAL VINDICTIVENESS

In his brief, Meda asserts that the government's decision to indict him in this case subjected him to prosecutorial vindictiveness.  For the reasons detailed below, we disagree.

### A.  FACTS

More than a year after trial, Meda moved to dismiss the indictment on prosecutorial vindictiveness grounds.  In his pro se motion, Meda argued that the prosecutors indicted him to retaliate against him for refusing to plead guilty in the Patient Choice/All American conspiracy.  He complained that the prosecutors were fully aware of his alleged fraudulent conduct at Acure at the time they decided to indict him for his conduct in the Patient Choice/All American conspiracy.  However, instead of charging Meda for his alleged crimes at Acure in the Patient Choice/All American indictment, the prosecutors opted to "lie in wait" and indict him for his conduct at Acure only if he was not convicted or refused to plead guilty in the Patient Choice/All American case.  Such conduct, Meda argued was improper and subjected him to prosecutorial vindictiveness.  Because the motion was filed after Meda filed his notice of appeal, the district

court determined that it did not have authority to decide the motion and denied it on waiver grounds.

## B. ANALYSIS

Normally, we review a district court's decision not to dismiss an indictment for prosecutorial vindictiveness for abuse of discretion. *United States v. LaDeau*, 734 F.3d 561, 565 (6th Cir. 2013). In this case, however, Meda's motion was untimely. *See* Fed. R. Crim. P. 12(b)(3). Therefore, we review the district court's decision for plain error. *See United States v. Soto,* 794 F.3d 635, 655 (6th Cir. 2015). There are four parts to plain-error review. First, there must be an error or defect that has not been intentionally relinquished or abandoned. *Id.* Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. *Id.* Third, the error must have affected the appellant's substantial rights. *Id.* Fourth, if the first three prongs are satisfied, this court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.*

A showing of vindictive prosecution requires (1) an exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right. United States v. Suarez, 263 F.3d 468, 479 (6th Cir. 2001).

Meda argues that the government indicted him in the Acure conspiracy because he refused to plead guilty and was acquitted in his prior case. (Appellant Br. 20.) This assertion is wholly unsupported by the record. Nothing in the record suggests that the government had a retaliatory motive when deciding to indict Meda in this case. Instead, the record reflects that the government indicted Meda solely because of his conduct at Acure. Importantly, Meda does not cite to any evidence supporting his allegations, as he relies only on his interpretation of the sequence of events that led to his indictment in this case. Without such evidence, we are not at liberty to speculate about what drove the government to bring charges in this case. We also cannot assume that the government intentionally withheld charges against Meda for improper purposes in the Patient Choice/All American conspiracy case.

In the end, since an indictment was returned, we must presume that Meda's charges were supported by probable cause, and thus it was within the government's discretion to pursue them further. See Suarez, 263 F.3d at 485. Meda has offered no evidence to rebut this presumption. Accordingly, we need not proceed further, as his claim is without merit.

## IV. COCONSPIRATOR STATEMENTS

Javidan argues that the district court committed reversible error by improperly admitting a number of statements pursuant to the coconspirator hearsay exception. For the reasons detailed below, we disagree.

In reviewing a trial court's evidentiary determinations, "this court reviews *de novo* the district court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (quoting *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005)). "This court has noted that '[t]his standard is consistent with the Supreme Court's admonition in *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), that we review evidentiary determinations for abuse of discretion, because it is an abuse of discretion to make errors of law or clear errors of factual determination.'" *Payne*, 437 F.3d at 544 (quoting *General Electric Co.*, 522 U.S. at 142).

The government asserts that Javidan failed to object to the testimony in dispute; therefore, we should review the district court's evidentiary rulings for plain error. Fed. R. Evid. 103(a)(2); *see, e.g. United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007). More precisely, the government argues that Javidan's objections were not specific enough to preserve this issue for appeal. (Appellee Br. 22.) Although very detailed objections were not provided, as she merely stated the rule of evidence that she believed the testimony would violate, when Javidan's counsel did object, her objections were sufficient to "bring into focus the precise nature of the alleged error."[4] *United States v. Estevez Antonio*, 311 F. App'x 679, 681 (4th Cir. 2009).

---

[4] Javidan's counsel failed to object to multiple evidentiary errors that she alleges were made by the district court. For those errors, the government is correct, we review for plain error. *See United States v. Arnold*, 486 F.3d 177, 193-94 (6th. Cir. 2007).

The requirements for admitting statements under Rule 801(d)(2)(E) are well established. "In order for a statement to be admitted under Rule 801(d)(2)(E), the offering party must prove by a preponderance of the evidence that the conspiracy existed, that the defendant was a member of the conspiracy, and that the coconspirator's statements were made in furtherance of the conspiracy." *United States v. Pike*, 342 F. App'x 190, 193 (6th Cir. 2009) (citing *United States v. Young*, 553 F.3d 1035, 1045 (6th Cir. 2009)).

At the outset, we note that Javidan does not argue, on appeal, that the conspiracy did not exist. Instead, she argues that district court improperly allowed into evidence statements that were made by individuals who were not her coconspirators. As stated above, we usually review that issue for abuse of discretion, because it requires review of the factual determinations of the district court—i.e. the district court's decision as to whom were Javidan's coconspirators. *See Payne*, 437 F.3d at 544. In her brief, Javidan specifies five instances, where she argues, that the district court improperly allowed Shahab to relay statements that were not made by her coconspirators.

First, Javidan contends that the government asked Shahab to testify about a conversation between him and Dr. Raval, who Javidan argues was not one of her coconspirators. Specifically, Javidan takes issue with the following exchange:

> Prosecutor: Did Dr. Raval tell you what he wanted from the patients in order to -- why he wanted the patients to come over?
>
> Meda's counsel: Objection as to hearsay, Your Honor.
>
> Prosecutor: This is a co-conspirator statement in furtherance …
>
> Javidan's counsel: Yes, I will have an ongoing objection to all of this.
>
> The court: No, overruled.
>
> Prosecutor: Did Dr. Raval tell you why he wanted the patients sent to his clinic?
>
> Shahab: Because he wanted to bill Medicare.

When making Rule 801(d)(2)(E) rulings, typically a district court would be required to specifically find that the declarant was a member of the conspiracy in the record as part of its *Enright* findings. *See United States v. Enright*, 579 F.2d 980, 985 (6th Cir. 1978); *see also United States v. Vinson*, 606 F.2d 149, 152-53 (6th Cir. 1979) (providing the three alternative methods by which a district court may make *Enright* findings). Interestingly, neither party's

brief cites to a place in the record showing that the district court made those findings.  In the past, we have ordered a remand when the district court failed to make *Enright* findings.  *See United States v. Castro*, 908 F.2d 85, 91 (6th Cir. 1990) ("It is error for the trial court to have failed to make the required *Enright* determination, and therefore this court REMANDS the case for resolution of the limited issue involved and retains jurisdiction over this case pending the district court's finding").  However, remand is unnecessary if we can "conclude with confidence" that the government met its burden in satisfying Rule 801(d)(2)(E)'s prerequisites by a preponderance of the evidence.  *United States v. Martinez*, 430 F.3d 317, 328 (6th Cir. 2005) (citing *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993)).

There is sufficient evidence in this record to support the district court's decision to overrule Javidan's objection.  As Shahab's direct examination continued, he stated that Dr. Raval provided Acure with its initial patients.  (Page ID. # 1655.)  Additionally, Shahab went on to explain that Dr. Raval requested $500.00 per patient, illustrating that Dr. Raval was aware of and complicit in the Medicare fraud at that was being perpetrated at Acure.  (Page ID. # 1655.)  Thus, we can "conclude with confidence" that the government met its burden of proving that Dr. Raval was one of Javidan's coconspirators.

Second, Javidan argues that the district court improperly allowed Shahab to respond to the government's question asking him to state whether he had "heard from [anybody] whether Mr. Meda was doing his own revisit notes - -." (Page ID # 1612.)  Javidan also takes issue with the government's question asking Shahab how he became aware of the fact that the therapists were not doing their own revisit notes.  (Page ID # 1614.)  Meda's counsel objected to both questions; Javidan's counsel only objected to the second question.  (Page ID # 1612-13.)

As to the first question, no responsive testimony was provided.  Thus, we need not review it further.  With regard to the second question, Shahab responded, somewhat confusingly, stating that,

> "My administrator Akhram Asrof has specified many times that I'm getting the notes and do not are given writing to show me I have seen that and being the owner also and that is why he has decided to not to use that therapist and start separately do in - -."

(Page ID # 1614.) Presumably, this testimony was introduced to substantiate Shahab's previous assertion that he knew Meda was not completing his own revisit notes, as is required by Medicare's billing policy.

Like Javidan's first claim of error, our review of the record reveals that there is sufficient evidence to allow us to "conclude with confidence" that Akhram Asrof was one of Javidan's coconspirators. Shahab affirmed that Akhram Asrof was "one of the people [who helped] submit … false billings to Medicare." Therefore, although the district court did not make *Enright* findings, Shabab's testimony was not improperly admitted.

Third, Javidan argues that the district court improperly allowed Shahab to testify about conversations he had with marketers, specifically an individual named Mr. Shannon, whom Patient Choice had employed, but later was employed by Javidan. Javidan takes issue with the following exchange:

> Prosecutor: Were the marketers continuing to bring patients in the same way you described as from Patient Choice?
>
> Shahab: Exactly same way.
>
> Prosecutor: And were they discussing that with you?
>
> Shahab: Marketers?
>
> Prosecutor: Yes?
>
> Shahab: Yes, because they know me very well, I have good relationship with them, too.
>
> Meda's counsel: Objection, Your Honor, I think there needs to be an identification of the marketers, if they're part of the co-conspiracy. I'm sorry, Judge, I'll back up. It is a hearsay objection unless it is co-conspirators he is talking about, but if it is co-conspirators, then I think the Government needs to provide what marketers he is hearing what information.
>
> The court: Please rephrase.
>
> Prosecutor: Can you list the marketers that Acure began to employ that you had previously employed?
>
> Shahab: That was Chris Collins has gone, Shannon has gone, Curtis Mallory has gone. Josine Williams, almost every one.
>
> Prosecutor: Did you discuss with Mr. Shannon how they got patients?
>
> Shahab: You mean with myself and Shannon?

Prosecutor: Yes?

Shahab: Yes. Definitely. And I know everything how he gets the patient.

Prosecutor: How does he get them?

Shahab: He goes to the senior citizen building or bring all the patients to in his apartment and he calls the doctor to come and see and then give the money to the patients and give the referral and everything is signed and bring the package to the home health care.[5]

(Page ID # 1629-31.)

Contrary to Javidan's assertion, the record clearly reveals that Mr. Shannon was her coconspirator. Prior to his employment at Acure, Shahab employed Mr. Shannon at Patient Choice. Both positions required him to help facilitate Medicare fraud. In fact, that was the basis of Shahab's testimony about Mr. Shannon. It is not difficult to glean from the record that he was a crucial member of the Acure conspiracy. Accordingly, we "conclude with confidence" that Mr. Shannon, like every other marketer employed at Acure, was one of Javidan's coconspirators.

Fourth, Javidan argues that the district court should not have allowed Shahab to testify about a number of statements made by Dr. Aly, who allegedly received illegal per-patient referral payments from Acure.[6] According to Shahab, Dr. Aly said that "I will make sure to see your patients first and you will be on priority and I will need $100.00 each for each patient to be seen and give you a referral." (Page ID # 2191.) Like Javidan's previous claims of error, Shahab's testimony sufficiently established that Dr. Aly was one of Javidan's coconspirators. Shahab chronicled his interactions with Dr. Aly and explained how Dr. Aly accepted numerous illegal kickback payments from Javidan. From Shahab's testimony, we gather that Dr. Aly was an integral part of the Acure conspiracy. Acure's Medicare fraud scheme could not have functioned without rogue physicians like Dr. Aly, as they initiated the fraud process by diagnosing healthy individuals as homebound, which, in turn, allowed Acure to submit fraudulent invoices to Medicare.

Lastly, Javidan takes issue with the district court's decision to allow Shahab to testify about why John Collins (Meda's former employer) discharged Meda. (Appellant Br. 7.) Meda's

---

[5]Javidan's counsel neglected to object. Thus, we review for clear plain error. *Arnold*, 486 F.3d at 193-94.

[6]Javidan's counsel neglected to object. Thus, we review for clear plain error. *Arnold*, 486 F.3d at 193-94.

counsel objected, arguing that John Collins was not a coconspirator.[7] (Page ID # 2219.) In response, the government asserted that the testimony was not hearsay because it was only offered to prove its effect on Javidan. (Page ID # 2219.) To clarify, the government did not argue that John Collins was a coconspirator. Instead, it argued that Shahab's testimony was not hearsay, and thus was not subject to the coconspirator exception to the rule against hearsay.

We conclude that the district court's ruling was correct, as Shahab's testimony was not hearsay. The government did not offer the testimony to prove that John Collins discharged Meda for the reasons Shahab stated. It offered the testimony to prove the impact it had on Javidan's state of mind prior to hiring Meda. Put differently, the government offered the testimony to prove that Javidan had reason to know why Meda was discharged, not to prove that Meda was actually discharged for the reasons stated by John Collins. Since the "significance [of the testimony in dispute] lies entirely in the fact that the words were spoken," the testimony was not hearsay. *See United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986) (discussing the definition of hearsay).

A final note. Although we disagree with all five of Javidan's claims of error, we also find that, even if the district court's rulings were incorrect, any error would be harmless. Evidentiary errors are subject to harmless error review. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). Under harmless error review, any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* Shahab's disputed testimony did little to strengthen the government's claim against Javidan. If the disputed testimony hurt anyone's defense, it was Meda's. In any event, notwithstanding Shahab's disputed testimony, the government presented enough evidence to convict Javidan without the disputed testimony. Accordingly, any evidentiary ruling mistake the district court may have made was harmless.

---

[7]Javidan's counsel neglected to object. Thus, we review for clear plain error. *Arnold*, 486 F.3d at 193-94

## V.  PRECULSION OF SASSAN KHOUBYARI'S TESTIMONY

Javidan asserts that the district court's decision to preclude, as hearsay, her husband, Sassan Khoubyari ("Khounyari"), from testifying about an alleged meeting he had with Acure's attorneys constituted reversible error.  We disagree.

### A.  FACTS

During the government's direct examination of Shahab, he testified about a February 2009 meeting with Javidan, Khoubyari, and another individual.  At the meeting, Shahab discussed how his companies, Patient Choice and All American, along with Javidan's company, Acure, would create fraudulent marketer contracts and invoices to give the appearance that the marketers were paid hourly, as opposed to per patient.[8]

Khoubyari testified in Javidan's defense, and he stated that Javidan was not present at the meeting.  He alleged that at this meeting he met with attorneys who provided him with legal advice, which he relayed to Javidan.  The government objected after Javidan's counsel asked him to detail the advice he relayed to Javidan.  The district court sustained the government's objection.

Subsequently, Javidan's counsel submitted a memorandum of law that argued that Khoubyari should be allowed to testify about his version of what was said at the meeting.  Specifically, it argued that his testimony should be allowed because (1) Javidan had a right to impeach Shahab's testimony about the meeting, (2) Javidan's Confrontation Clause rights would be violated, and (3) the proposed testimony was not hearsay.

The government responded, arguing that (1) "Javidan could not impeach an earlier witness by offering hearsay testimony through a later witness," (2) Javidan had the full ability to exercise her right to confront Shahab, and (3) Khoubyari's proposed testimony would constitute inadmissible hearsay.

---

[8]In February 2009 the State of Michigan asked Patient Care to provide its marketer contracts, which allegedly prompted the meeting.

In a written order, the district court ruled that Khoubyari's proposed testimony was not admissible under Federal Rule of Evidence 802 or 608(b) and that prohibiting Khoubyari's proposed testimony would not offend the Confrontation Clause.

### B. ANALYSIS

When examining a district court's evidentiary determinations, we review *de novo* conclusions of law and review for clear error any factual determinations that underpin the district court's legal conclusions. *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006). As to the district court's hearsay determination, we review that decision *de novo* because it calls for us to decide "whether evidence offered at trial constituted hearsay within the meaning of the Federal Rules of Evidence." *See id.* (quoting *Field v. Trigg County Hosp., Inc.*, 386 F.3d 729, 735 (6th Cir. 2004)).

In arguing that Khoubyari's proposed testimony was not hearsay, Javidan states that the testimony would prove "a different version of what [] Javidan did." (Appellant Br. 26.) Specifically, she goes on to propose that,

> if a jury were to accept Mr. Khoubyari's testimony that, rather than being about falsification of invoices of backdating of contracts, the meeting featured attorneys talking about the *legal* ways of paying marketers, then it would have a different view of Ms. Javidan's guilty knowledge than if it accepted Mr. Shahab's version of the meeting.

(Appellant Br. 26.)

Respectfully, we conclude that Javidan is mistaken. Proposing that the jury should accept Khoubyari's version of events, as opposed to Shahab's, is an implicit admission that Khoubyari's testimony was offered to prove the truth of the matter it asserted. *See* Fed. R. Evid. 801(b). Javidan argues that she offered the testimony to prove her "state of mind." (*See* Appellant Br. 27.) But her brief makes clear that she put her husband on the stand to offer a different version of the meeting than the one that was offered by Shahab. Therefore, the proffered testimony was hearsay.

We also find that even if this proffered testimony was not hearsay, the district court's decision not to admit it constituted harmless error. Due the abundance of incriminating evidence against Javidan in the record, Khoubyari's testimony would not have changed the outcome of the trial. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) ("The harmless error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of a trial was not affected by evidentiary error.") (citations omitted).

## VI. PRECLUSION OF SARAH KHAN'S TESIMONY

Javidan argues that the district court's decision not to order the government to grant immunity to one of her proposed witnesses, Sarah Khan ("Khan") was a reversible error. Based on her brief, it also appears that she is attempting to assert a witness-intimidation claim as well. Due to the reasons explained below, we find that the district court's decision not to order the government to immunize Khan was correct and that her witness-intimidation claim is meritless.

## A. FACTS

Shortly before trial, Javidan identified Sarah Khan ("Khan"), a patient data-entry employee at Acure, as a potential witness. Sometime before Khan was identified as a potential witness, the government alleged that it had learned that Khan was "engaged in fraud at Acure." The government suggested the district court appoint counsel for Khan so that Khan could be advised of her rights, including her Fifth Amendment right not to testify. Against Javidan's protest, the district court provided counsel for Khan. The government made Khan's counsel aware of the incriminating evidence it had against Khan. Not surprisingly, Khan followed her counsel's advice and decided to interview or testify only in exchange for immunity, which the government refused to provide. Javidan filed a motion requesting that the district court conduct a hearing outside of the jury's presence to determine if Khan's testimony was admissible and whether the government should be required to extend immunity to Ms. Khan. The district court held a hearing outside the presence of the jury, in which the government proffered information it considered inculpatory. The district court was satisfied "relative to her invocation of the right."

## B. ANALYSIS

We review the district court's decision whether to allow Khan to take the stand after being advised of her intention to invoke her Fifth Amendment right not to testify for abuse of discretion. *United States v. McAllister*, 693 F.3d 572, 583 (6th Cir. 2012). Since Javidan did not raise her witness intimidation claim in the district court, we review that claim for plain error. *United States v. Pierce*, 62 F.3d 818, 831 (6th Cir. 1995).

Witness Intimidation

To establish a claim of witness intimidation, a defendant must present "government conduct which amounts to substantial interference with a witness' free and unhampered determination to testify" and must prove that any inappropriate conduct was not harmless. *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007).

Javidan argues that the prosecutor's improper conduct "drove Kahn off the stand." (Appellant Br. 31.) To support that argument, Javidan attempts to distinguish her case from this court's ruling in *Davis v. Straub*, 430 F.3d 281 (6th Cir. 2005). In *Davis*, after a defendant's witness was called to the stand, the prosecutor requested a side bar with the judge, where he informed the court that the witness was a suspect and should be informed of his constitutional rights. *Id.* at 287. After questioning the witness, the district court appointed counsel to advise him of his rights. *Id.* On appeal, we found that the prosecutor's conduct was not improper, especially considering a prosecutor's ethical obligations, which include,

> Advis[ing] a witness who is to be interviewed of his or her rights against self-incrimination and the right to counsel whenever the law so requires. It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution.

*Id.* (citing the ABA Standards for the Administration of Criminal Justice § 3-3.2(b)).

Although the facts of *Davis* are virtually analogous to her case, Javidan contends that since *Davis* was a habeas case its analysis should not apply, an assertion for which she cites no authority. (Appellant Br. 31.) Regardless of the fact that *Davis* was a habeas case, our determination with regard to the actions of the prosecutor are not limited to *Davis*, because the

government prosecutor in this case was bound by the same ethical obligations as the prosecutor in *Davis*.

Javidan also attempts to distinguish her case from *United States v. Stuart*, 507 F.3d 391 (6th Cir. 2007). In *Stuart*, the defendant contended that the prosecutor's references to perjury charges caused him and two of his witnesses not to testify. *Id.* at 398. This court found that the defendant's assertions were unfounded and that the district court properly warned him about the penalties of perjury, while informing him that the ultimate decision about whether to testify was his own. *Id.* In fact, both the district court and prosecutor went out of their way to make sure that the defendant knew he was not being threatened. *See id.*

Javidan argues that the district court in this case erred because, unlike the district court in *Stuart*, Khan was not advised that the decision about whether to testify was her own. (Appellant Br. 32.) Unlike the defendant in *Stuart*, Javidan does not contend that the government prosecutor threatened Khan with a perjury charge. Thus, such a reminder was not required or warranted.

Lastly, Javidan alleges that the government prosecutor did not decide to "investigate" Khan until she was put on her witness list. (Appellant Br. 33.) Javidan, however, was not privy to the government's plans. Nor, does she allege that she received this knowledge from someone who was. What is undisputed is that the prosecutor possessed information that criminally implicated Khan. Therefore, the prosecutor had an ethical obligation to act as she did. *See Davis*, 430 F.3d at 287. Since Javidan has not identified any inappropriate government conduct, her witness intimidation claim fails.

<u>Failure to Grant Immunity</u>

This court has long held that a district court is without authority either to grant immunity to a witness who asserts his Fifth Amendment privilege against self-incrimination, or to force the government to do so. *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999). However, we have discussed two limited situations when such immunity may be warranted: if it is necessary to enable a defendant to present an effective defense and/or where it is necessary to remedy prosecutorial misconduct. *Id.*

Under the prosecutorial-misconduct exception, due process requires an immunity grant when the prosecution abuses its discretion by intentionally attempting to distort the fact-finding process. *Id.* at 998. This court has acknowledged that this exception exists in other jurisdictions, but we have yet to adopt the exception itself. *See, e.g.,United States v. Allebban*, 578 F. App'x 492, 505 (6th Cir. 2014). Javidan urges us to adopt it in this case. (Appellant Br. 36.) But, even if we were inclined to explicitly adopt this exception, we could not do it in this case because, as detailed above, the prosecutor did nothing improper.

The effective-defense exception is valid in the Sixth Circuit only if the government selectively granted immunity to its own witnesses but denied immunity to the defendant's witnesses. *Id.* (citing *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991)). To do otherwise could deprive the defendant of a fair trial. *Id.* However, a defendant does not have an authomatic right to have his or her witnesses immunized simply because the prosecution relies on immunized witnesses to make its case. *Id.* Instead, the evidence must be so "egregiously lopsided" that an unfair trial would otherwise take place. *Id.*

In this case, the government refused to grant immunity to one of Javidan's witness, Khan. Even if we were to entertain the proposition that Khan was prepared to testify effectively for Javidan, it cannot be said that an unfair trial took place without her testimony. Moreover, Javidan does not allege that the government relied upon immunized witnesses to make its case, while refusing to immunize Khan. Thus, the "pick and choose" aspect of this claim is nonexistent. Accordingly, we find that the district court did not err in refusing to grant immunity to Khan.

Alternative Measures

Alternatively, Javidan argues that even if the district court decided not to grant Khan immunity, it should have still allowed Khan to testify, but precluded the government from cross-examining her about her alleged fraudulent acts or prevented the government from cross-examining her completely. (Appellant Br. 37.) No citation was provided to support this proposition. Thus, it need not be addressed. *See* Fed. R. App. P. 28(a)(8)(A).

Javidan also argues that the district court could have compelled Javidan to invoke the Fifth Amendment privilege in front of the jury. (Appellant Br. 37.) She asserts that this alternative would have posed no risk on appeal because "it was specifically requested by the defense." *Id.* She cites *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993), in support of this contention. Her reliance in *Sharpe* is misplaced. *Sharpe* does not stand for the proposition that a defendant can compel the trial court to commit appealable errors as long the defendant promises not bring up the issue on appeal. The district court correctly decided this issue, see *United States v. Arnott*, 704 F.2d 322, 324-25 (6th Cir. 1983), and was not obligated to oblige Javidan's request.

## VII.  ALLEGED SENTENCE CALCULATION ERRORS

Javidan argues that the district court committed multiple errors in calculating her sentence. For the reasons explained below, we disagree.

## A.  FACTS

After the jury verdict, the probation department prepared a presentence investigation report ("PSR"). The PSR specified that Javidan's base level offense was 24, which was calculated by totaling her base offense level of six, two levels for employing sophisticated means, and 16 levels because her scheme resulted in a loss between $1 and 2.5 million. The PSR also added four levels because Javidan was an organizer or leader of the scheme. This resulted in a total offense level of 28, which yielded an advisory sentencing range of 78-97 months.

Javidan submitted a sentence memorandum that challenged the PSR's monetary loss calculation and the organizer-leader enhancement. With regard to the PSR's monetary calculation, Javidan argued that the government had not put forth sufficient evidence to prove that all of Acure's Medicare receipts were obtained via fraud. As to the organizer-leader enhancement, she argued that Shahab clearly ran her business; thus, she should not be considered the organizer or leader.

The district court adopted the PSR's findings. Although it could have sentenced Javidan to a term between 78-97 months, it chose to impose a sentence of 65 months.

**B. ANALYSIS**

Loss Calculation and Leadership Enhancement

We review a district court's calculation of the "amount of loss" for clear error, but consider the methodology behind it *de novo*. *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). For loss calculation purposes, a district court need only make a "reasonable estimate" of the loss. *United States v. Mahmud*, 541 F. App'x 630, 635 (6th Cir. 2013) (citation omitted)

In determining the monetary loss, the government had to initially show by more than a preponderance of the evidence the amount of the total loss. *Id.* at 636. The district court found that "the Government more than met its burden that Acure was entirely a fraud." (Page # ID 6371.) It based its finding on the testimony of multiple witnesses. (Page # ID 6371.) Accordingly, the district court found that the $2.2 million figure produced in the PSR was accurate. (Page ID # 6369.) Once the district court made this finding, the burden was on Javidan to prove how much of her business was legitimate. *See id.* ("Once the Government met its burden to prove the total amount, it was [the defendant's] burden to prove 'the specific value' by which the loss amount should have been reduced"). Javidan did not meet this burden, as she neglected provide any evidence. (Page ID # 6409-11.) Therefore, since Javidan did not meet her burden and because the district court's finding was supported by evidence in the record, we hold that the district court's loss calculation was a "reasonable estimate of the loss" and that no clear error occurred. *See Muhmud*, 541 F.App'x. at 636.

Javidan contends that her business was not shown to be entirely fraudulent at trial, because she offered witnesses who testified that some of her business was legitimate. (Appellant Br. 44.) As shown above, the district court did not commit a clear error in deciding the loss amount. Moreover, the district court's methodology was also correct. *See Muhmud*, 541 Fed. App'x. at 636. The district court provided Javidan an opportunity to produce evidence to prove what amount of Acure's Medicare business was legitimate, as is required by *Muhmud* when a district court determines that an enterprise was completely fraudulent. Javidan failed to produce any evidence. (Page ID # 6409-11.) Consequently, she is not allowed to use this court for a second bite at the apple.

Javidan also argues that she should not have been deemed a leader or organizer of Acure's fraud scheme. The Sentencing Guidelines provides for a four-level enhancement "if the defendant was an organizer or leader of a criminal activity that involved five or more participants of was otherwise extensive." *See* U.S.S.G. § 3B1.1(a). As pointed out by the government in its brief, Javidan had all the indicia of Acure's leader/organizer in its Medicare fraud scheme. It is undisputed that she was a part owner of Acure (an enterprise that the district court found to be entirely fraudulent), that she signed Medicare's enrollment form, and that she was the sole signature authority on Acure's bank accounts. Based on those facts alone, the district court did not commit a clear error in finding her as leader/organizer.

<u>Reasonableness of Sentence</u>

The substantive reasonableness of a sentence is reviewed under an abuse of discretion standard. *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). In reviewing for substantive reasonableness, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* Importantly, a below-the-Guidelines sentence is presumed not to be unreasonably severe. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

In arguing that her sentence was not substantively reasonable, Javidan alleges that the district court placed excessive weight on factors that lengthened her sentence. (Appellant Br. 52-54.) Not only is that assertion not supported by the record, but the record reflects that the district court took many of her mitigating factors into account when deciding to sentence her to shorter term than the PSR recommended. Thus, her argument is without merit.

**VI. CONCLUSION**

Based on the foregoing, we **AFFIRM** Meda's and Javidan's convictions and also **AFFIRM** Javidan's sentence.