RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JESSE GREGORY FAIRLEY,

*Defendant-Appellant*.

> No. 22-3923

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cr-00672-1—Pamela A. Barker, District Judge.

Decided and Filed:  May 8, 2025

Before:  CLAY, WHITE, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Dennis C. Belli, LAW OFFICE, Columbus, Ohio, for Appellant.  W. Connor Winn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────────

## OPINION

─────────────────

DAVIS, Circuit Judge.  In September 2020, Jesse Fairley chose a local convenience-store parking lot as his base of operation to sell crack cocaine.  He caught the eye of a local law-enforcement officer assigned to a federal task force, who watched Fairley conduct hand-to-hand transactions in the parking lot.  When members of law enforcement closed in on Fairley and searched the parked vehicle he had frequented throughout the surveillance of his activities, they found handguns and a "bunch" of cash sitting in the open, as well as crack cocaine and marijuana in a compartment next to where Fairley had been seated.  (Trial Tr., R. 59, PageID

457).   A jury convicted Fairley of possessing with the intent to distribute crack cocaine, possessing a firearm after a felony conviction, and possessing a firearm in furtherance of a drug-trafficking crime.   After receiving a thirty-year sentence, Fairley promptly appealed his conviction.

On appeal, Fairley raises five issues for this panel's review: (1) whether his convictions are  supported by sufficient evidence of possession; (2) whether the jury instructions on third-party guilt were misleading and confusing in a way that tainted his convictions; (3) whether the cumulative effect of purportedly erroneous evidentiary rulings deprived Fairley of his due process rights; (4) whether the government's communications with a defense witness were improper and  violated Fairley's due process rights; and (5) whether the government's closing remarks were improper and deprived Fairley of his right to a fair trial.

For the following reasons, we **AFFIRM**.

## I.    BACKGROUND

On September 17, 2020, Detective Mathew Pollack of the Cleveland Police Department ("CPD") sat across the street from the Little Eagle Food Market, using binoculars to observe Fairley and then 16-year-old Terrez Wilson as they spent time in the store's parking lot.  Pollack watched Fairley and Wilson repeatedly get into and out of a brown BMW sport utility vehicle (alternately "the SUV").   During this time, Pollack saw Fairley conduct two suspected hand-to-hand drug transactions.  And he watched Wilson conduct at least one such transaction.

Based on his observations, Pollack suspected that Fairley and Wilson were selling crack cocaine (alternately "crack").   Pollack saw Wilson give a white, rock-shaped substance to his customer.   And he noticed that one of Fairley's customers—a disheveled woman who entered and exited the parking lot after receiving an item that Fairley pulled out of a bag in his pants—appeared to be "more like a hardcore drug user versus just somebody who smokes marijuana occasionally."  (*Id.* at 352).

After watching several transactions, Pollack summoned other officers to the location. The responding officers approached the BMW that Pollock had seen Fairley and Wilson

repeatedly entering and exiting. Fairley was seated in the front passenger seat, and Wilson and three women were seated in the back seat as officers approached. Wilson's sister, who had been seated in the driver's seat, had exited the vehicle to go into the store just before the officers arrived. Fairley quickly exited the vehicle from the front passenger side with cash in his hand. Officers detained and questioned Fairley. Afterward, officers searched the BMW.

Inside the BMW, officers found "a pretty large amount" of crack cocaine, (Trial Tr., R. 60, PageID 587), as well as marijuana, cash, and two loaded firearms—a Glock 19, 9 mm semi-automatic pistol and a Ruger LCP .380 pistol—in the area between the driver's seat and the passenger's seat. More particularly, they found the two pistols sitting atop the emergency brake, near the gear shift located in the center console. And officers found a bag of crack inside a covered storage compartment toward the back of that same console. There was also cash in the open compartment of the center console next to the guns, on the floor, and on one of the seats; and a bag of marijuana sitting in the console. A digital scale was in the driver's side door pocket.

Fairley denied that either the Glock or the Ruger belonged to him. He claimed that all the contents of the BMW belonged to its male owner, who the police had failed to stop. But Fairley's story changed over the course of his law enforcement encounter that day. For instance, Fairley first denied dealing any drugs. Then, after officers told Fairley that one of them had observed him conduct multiple hand-to-hand transactions, Fairley stated that he had sold some marijuana, while continuing to deny that the crack and firearms belonged to him.

As relevant here, a federal grand jury indicted Fairley for: possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) (Count 4); being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) (Count 5); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 6).[1] At trial, prosecutors posited that Fairley jointly possessed both the crack and the firearms with another or others. In defense, Fairley argued that he possessed neither. Instead, according to Fairley, some third-party actor(s) possessed the contraband.

---

[1]The grand jury also indicted Fairley on three identical charges stemming from a January 29, 2020 incident. Those charges were dismissed before trial.

Fairley twice moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29: once after the government rested its case and again after the defense rested. In both instances, the district court heard argument from the parties and denied the motion, determining there was "sufficient evidence for the jury to find guilt beyond a reasonable doubt." (Trial Tr., R. 60, PageID 593–99, 643–44). In the end, the jury found Fairley guilty on all three counts. Fairley received a thirty-year prison sentence to be followed by five years of supervised release. He promptly appealed.

## II.    SUFFICIENCY OF THE EVIDENCE

*Standard of Review.* "We review 'de novo the sufficiency of the evidence to sustain a conviction.'" *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (emphasis omitted) (quoting *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009)). In doing so, "[w]e draw all available inferences and resolve all issues of credibility in favor of the jury's verdict[;] . . . it is not necessary for us to exclude every reasonable hypothesis but guilt." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Ultimately, we consider whether, viewing the record as a whole, there is "substantial and competent evidence" to support the judgment. *United States v. Jackson*, 918 F.3d 467, 478 (6th Cir. 2019) (quoting *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015)). That is, we assess whether any rational trier of fact could have found the essential elements of the convicted crimes beyond a reasonable doubt. *Id.*

*Actual and Constructive Possession Defined.* Fairley first argues that the government presented insufficient evidence to establish that he possessed the crack and firearms seized from the BMW. These failings, he asserts, should have led the district court to grant his motion for acquittal. Because ample evidence supported the jury's conclusion that Fairley possessed both the firearms and the crack cocaine, we disagree.

As an initial matter, possession can be either actual or constructive. *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007). Actual possession exists when the contraband at issue is within the immediate power or control of the individual. *Id.*; *see also Taylor*, 800 F.3d at 709 ("[A]ctual possession exists where the defendant has physical contact with a firearm-e.g., he holds it, holsters it, or keeps it in a place where it is immediately accessible") (citation and

internal quotation marks omitted)). And "constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Gardner*, 488 F.3d at 713 (alteration adopted) (citation and internal quotation marks omitted); *see also United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008); *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977), *as recognized in United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385 (6th Cir. Mar 6, 2024)). Both types of possession can be established through either direct or circumstantial evidence. *Craven*, 478 F.2d at 1333.

Another word about constructive possession; a defendant's mere proximity to contraband is not enough. There must be "other incriminating evidence." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (citation and internal quotation marks omitted). This means the government must produce additional evidence showing "knowledge of, access to, and an intent to exercise control over [the contraband]" to meet this "minimal" burden. *United States v. Walker*, 734 F.3d 451, 456–58 (6th Cir. 2013) (citation omitted) (finding sufficient evidence of constructive possession based on the defendant's proximity to a firearm, plus the defendant's "unnatural" movements, positioning of the weapon in a way that made it easy for the defendant to grab it, and fact that the gun was in plain view when officers opened the car door).

*Fairley's Possession of Crack and Firearms.* Fairley argues that his convictions were not supported by sufficient evidence of constructive possession. Drawing all inferences in favor of the jury's verdict, the government presented substantial and competent evidence that Fairley constructively possessed the seized crack and firearms.[2] First, the crack: officers found both crack and marijuana in the center console, directly next to where Fairley was sitting just before his quick departure from the BMW. Though the crack was not visible, Fairley was the only front-seat occupant and needed only lift the compartment lid next to him to view and retrieve the

---

[2]The government argues that it presented sufficient evidence to establish that Fairley either actually or constructively possessed both the guns and drugs. Because we conclude that, contrary to Fairley's argument, the evidence was sufficient to show constructive possession, we need not address the actual possession theory.

drugs. And the jury heard evidence beyond Fairley's proximity to the crack. For instance, Pollack saw Fairley getting into and out of the BMW multiple times and twice watched him complete apparent hand-to-hand drug transactions. He also noted that at least one of Fairley's customers appeared to be a user of hard drugs—an observation from which a juror might deduce a crack rather than marijuana transaction. Further, when officers questioned Fairley, he first denied selling *any* drugs. But once the officers informed Fairley that they had seen him conducting hand-to-hand transactions, he admitted he had been selling marijuana. His initial denial, followed by a minimizing statement, are evasive tactics which can support a finding of constructive possession. *See United States v. Newsom*, 452 F.3d 593, 610 (6th Cir. 2006). And given that marijuana, which Fairley admitted to selling, was in the same console as the crack—readily accessible to Fairley—the jury could reasonably infer that Fairley knew both drugs were there and he controlled access to them. From these circumstances, a rational juror could conclude that Fairley constructively possessed the crack intending to distribute it.

The same is true for Fairley's possession of the two firearms. As officers approached the BMW, the pistols rested in plain view on top of the center console area, to Fairley's immediate left, within arm's reach. Because the weapons were sitting out in the open, Fairley's knowledge of their presence cannot be reasonably questioned. And unlike in *Bailey*, where we determined that evidence of a rifle under the defendant's seat in a recently stolen vehicle could not show constructive possession, 553 F.3d at 945–48, Fairley was not in an unfamiliar vehicle. Indeed, Fairley had a history of exercising dominion and control over the BMW. The SUV belonged to Fairley's self-described "spouse," Shanena Stevens, and Fairley regularly drove it when Stevens was not present. Officers also found a receipt identifying Fairley as the customer for an oil change for the BMW. And the guns were resting near a large pile of cash and crack, both of which a jury reasonably could have determined belonged to Fairley—to that point, Fairley exited the vehicle with some of the cash in hand. Fairley also admitted that a small puppy resting near the gas pedal of the vehicle was his and his alone. The receipt, combined with Fairley's regular use of the vehicle without his spouse and the presence of his puppy in the driver's area of the vehicle, add to the picture of his dominion and control over the vehicle, even if he did not drive it to Little Eagle that day. *See United States v. Hall*, 20 F.4th 1085, 1106 (6th Cir. 2022) (stating that "'ownership, dominion, or control over the contraband itself or the . . . vehicle'" where it is

found can show constructive possession) (quoting *United States v. White*, 932 F.2d 588, 589 (5th Cir. 1991)).  Add to that, Fairley still claimed the owner of the contraband was the male driver of the vehicle, who had evaded police.  This evasive conduct supports rather than detracts from a finding of dominion and control.  *See Newsom*, 452 F.3d at 610.  And that is enough to establish constructive possession.

In sum, viewing this evidence in the light most favorable to the government, and applying all available inferences in favor of the jury's verdict, a rational juror could conclude that Fairley was aware of the presence of the crack and firearms, intended to exercise dominion and control over them, and did so.  *See Walker*, 734 F.3d at 456–58.

### III.    JURY INSTRUCTIONS

Fairley next contends that the district court's jury instructions could have misled and confused the jurors about third-party guilt and therefore warrant reversal of his convictions.  We disagree.

*Standard of* Review.   We review the district court's jury instructions for abuse of discretion.  *United States v. Eaton*, 784 F.3d 298, 306 (6th Cir. 2011); *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010).  The standard for reversing a conviction based on a claim of improper instructions is high.  *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011).  We "may reverse a judgment [based on an improper jury instruction] only if the instructions, viewed as a whole, were confusing, misleading, and prejudicial."  *Id.* (quoting *United States v. Young*, 553 F.3d 1035, 1050 (6th Cir. 2009)).

*Third-Party Guilt Jury Instruction*.  Police observed both Wilson and Fairley conducting hand-to-hand drug transactions in the Little Eagle parking lot.  And they saw both individuals frequently getting in and out of the BMW.  As a result, the government pursued a theory of joint possession at trial—meaning that both people equally possessed the guns and drugs found in the BMW.  *See Hall*, 20 F.4th at 1106–07.  But Fairley's defense centered on the theory that Wilson alone, or some other person with access to the BMW, possessed the contraband.  He challenges the following instruction given at trial:

I want to emphasize that the defendant is only on trial for the particular crimes charged in the indictment. Your job is limited to deciding whether the Government has proved the crimes charged.

Also, keep in mind that whether anyone else should be or has been prosecuted and convicted for these crimes is not a proper matter for you to consider. The possible guilt of others is no defense to a criminal charge. Your job is to decide if the Government has proved the defendant guilty. Do not let the possible guilt of others influence your decision in any way.

(Trial Tr., R. 61, PageID 790, 871).

The district court fashioned this instruction after Sixth Circuit Pattern Criminal Instruction ("PCJI") 8.08(2), making only minor modifications. While we have acknowledged that PCJI 8.08(2) can be misleading at times, *see, e.g.*, *United States v. Larch*, 399 F. App'x 50, 55 (6th Cir. 2010); s*ee also* PCJI 8.08, Committee Commentary, that is not the case here. We have upheld iterations of this instruction in cases where the instruction appropriately conveys (1) "the jury's obligation to determine whether the evidence conclusively proved the defendant guilty" and (2) "that it should not permit the possible *additional* criminal liability of others to influence its decision." *See Larch*, 399 F. App'x at 55 (alterations in original). In cases of joint possession, where the defendant does not claim mistaken identity, an instruction similar to PCJI 8.08(2) comfortably fits in this category. *Id.*

Here, the government propounded that Fairley and Wilson jointly possessed the firearms and crack. Under this theory, Wilson's guilt would not prevent the jury from finding that Fairley also possessed the crack and firearms. Fairley did not claim mistaken identity; he denied culpability. Thus, the district court's charge to the jury on this point was consistent with a permissible theory for liability and was not confusing. The instruction emphasized the jury's responsibility to assess Fairley's culpability alone, and not to consider whether someone else also "should be or has been prosecuted [or] convicted." (Trial Tr., R. 61, PageID 790). In this way, the instruction operated as it should; it ensured that Fairley would neither be held responsible for someone else's conduct nor excused of his own.

For these reasons, Fairley's reliance on *United States v. Farrow* is unavailing. 574 F. App'x 723 (6th Cir. 2014). In *Farrow*, the defendant argued mistaken identity. *Id.* at 725.

Therefore, an instruction to jurors that they need not allow the guilt of a third party to affect their verdict was potentially problematic: If they believed someone else *instead of* Farrow committed the crime, then an instruction telling them to ignore the third party's liability could result in the conviction of an innocent person. *See id.* at 731. There was no chance of that here. Fairley could not plausibly argue that someone else instead of him was in the Little Eagle parking lot that day conducting drug transactions and repeatedly accessing a car stocked with firearms and crack. Police surveilled him for quite a while before approaching him. Instead, Fairley pursued a theory that others in the BMW possessed the firearms and crack exclusively to defeat the government's theory of joint possession. (ECF 43, Appellant Br. at 12 ("Fairley's entire defense was premised on a contention that another occupant of the vehicle . . . was the sole possessor of the crack cocaine and firearms.")). The court instructed the jury on joint possession and gave a limiting instruction that Fairley's mere presence with others who were in possession of contraband was not enough to support a conviction. (Trial Tr., R. 61, PageID 803 ("But remember that just being present with others who had possession is not enough to convict.")). The jurors, therefore, knew that they needed to make a separate determination specific to Fairley, and there is no reason to conclude that the court's slightly modified PCJI 8.08(2)-instruction confused them in any way.

## IV. EVIDENTIARY RULINGS

Fairley also challenges several of the trial court's evidentiary rulings and asserts that the cumulative effect of these purportedly erroneous decisions deprived Fairley of due process. Specifically, he contends that the district court improperly (1) allowed expert testimony from CPD Detective Donald Kopchak,[3] (2) admitted Fairley's statements relating to past and subsequent crimes, and (3) admitted images of Fairley in possession of large sums of money indicative, according to the government, of drug trafficking.

---

[3]Kopchak was simultaneously assigned as a Task Force Officer for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), during the events underlying Fairley's arrest.

A. Expert Testimony—CPD Detective Kopchak

At trial, defense counsel objected on relevance grounds to Kopchak providing expert opinion testimony. The district court overruled the objection. Fairley asserts that his objection preserved the issue he now appeals, and we should review for abuse of discretion. Conversely, the government contends that Fairley "advances new grounds on appeal" not based on relevance, so plain error review applies. (ECF 58, Appellee Br. at 21–22). We need not settle this dispute because under either standard, the answer remains the same. So, we will review the district court's decision to exclude expert testimony using the less deferential abuse of discretion standard. *See United States v. Anderson*, 67 F.4th 755, 767 (6th Cir. 2023) (quoting *United States v. Gardner*, 32 F.4th 504, 519 (6th Cir. 2022)). We will find such an abuse of discretion only where the district court's ruling leaves us "'with a definite and firm conviction that [the district court] committed a clear error of judgment.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (quoting *Conwood Co., L. P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002)).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Courts may permit such testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also, e.g.*, *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020). *Daubert v. Merrell Dow Pharmaceuticals, Inc.* explains that this requirement "goes primarily to relevance." 509 U.S. 579, 591 (1993). Though the "relevancy bar is low," the proffered testimony must "logically advance[] a material aspect of the proposing party's case" to satisfy the standard. *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (citation and internal quotation marks omitted). Even where relevant, under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." *Id.* at 444 (citation and internal quotation marks omitted). Here, we recognize as an initial matter that "'[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror.'" *United States v. Jaffal*, 79 F.4th 582, 603 (6th Cir. 2023) (quoting *United States*

*v. Dunnican*, 961 F.3d 859, 876 (6th Cir. 2020)).  We therefore begin by probing the utility of Kopchak's testimony about the particulars of the drug-trafficking trade.

Kopchak testified as both an expert and a fact witness for the government.  For his expert opinions, Kopchak drew from his training and service as an ATF Task Force Officer for approximately five years and his experience handling narcotics cases in CPD's vice unit for approximately five to six years at the time of the trial.  In our view, the expert opinions Kopchak offered at trial could help jurors better understand the drug-dealing practices relevant to this case.  For instance, Kopchak explained how drug dealers typically produce, package, and distribute crack cocaine.  He explained that drug dealers commonly carry multiple types of drugs to diversify their revenue sources.  He also informed the jury that dealers sometimes keep smaller amounts of narcotics in their vehicle or on their person for dealing, while storing larger amounts elsewhere, so that if law enforcement catches them with drugs, they will be held responsible for a smaller quantity than they otherwise would be.  Given the way the crack found in the BMW was stored and the factual circumstances surrounding the hand-to-hand transactions officers observed, these details of the trade provided useful context for the factfinder.  Kopchak also advised that it is common for drug dealers to carry firearms for protection.  Other particulars that he described or explained included (1) that drug dealers, rather than drug users, typically possess and use digital scales to weigh the drugs they are distributing to avoid giving customers free drugs; (2) how drug dealers utilize social media; and (3) why officers might have difficulty acquiring fingerprints from a firearm.  These insights go beyond mundane observations and the common knowledge of everyday people not involved in the illicit drug trade.  And they are consistent with testimony we have allowed in other cases.  *See, e.g.*, *United States v. Wilson*, 837 F. App'x 396, 399 (6th Cir. 2020) (relying on expert testimony that drug dealers use multiple cell phones and carry large amounts of cash); *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (allowing law enforcement expert testimony on the role firearms play in drug trafficking activity).

Here, the government had to prove that Fairley intended to distribute the crack they found.  So, its appearance and the way it was packaged were relevant considerations for the jury.  Similarly, the reasons for maintaining a set of digital scales near illegal narcotics may not be

readily apparent to someone not involved in the drug trade or law enforcement. And given that the government pursued alternative theories of actual and constructive possession, an explanation of the difficulty of obtaining fingerprints from firearms could assist the jurors in weighing the evidence. Considering these connections to the evidence, we are not left with a definite and firm conviction that the district court erred in permitting Kopchak's testimony under Rule 702.

## B. Rule 404(b) Evidence

Fairley challenges the district court's admission of evidence of his other criminal activity. Federal Rule of Evidence 404(b) prohibits trial courts from permitting evidence of other crimes or wrongs ("bad acts") to be used to prove character or propensity to violate the law. Fed. Rule Evid. 404(b). However, such evidence may be admitted for other purposes, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Trial courts have "broad discretion" in determining the admissibility of evidence under Rule 404(b). *United States v. Clemis*, 11 F.3d 597, 600 (6th Cir. 1993) (quoting *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989)). We review their exercise of that discretion using a three-part test:

> First, we review for clear error the factual determination that other acts occurred. Second, we review *de novo* the legal determination that the acts were admissible for a permissible 404(b) purpose. Third, we review for abuse of discretion the determination that the probative value of the evidence is not substantially outweighed by unfair prejudicial impact.

*United States v. Adams*, 722 F.3d 788, 810–11 (6th Cir. 2013) (emphasis omitted); *cf. Jaffal*, 79 F.4th at 594 ("acknowledging an . . . intra-circuit split regarding the standard of review for Rule 404(b) evidence, but concluding that the abuse of discretion and tripartite standards of review are not in fact inconsistent, because it is an abuse of discretion to make errors of law or clear errors of factual determination." (citation and internal quotation marks omitted)).

Fairley raises two distinct Rule 404(b) challenges, both relating to evidence about his involvement in other crimes—one before and one after his arrest at the Little Eagle Market. First, several months before Fairley's arrest in this case, Kopchak interviewed Fairley as a potential government informant. Kopchak testified at trial that Fairley admitted to him during

this earlier interview that he (Fairley) received guns from a specific local gang. Fairley also identified the source(s) he used for his powder cocaine and crack cocaine trafficking and indicated that he was unwilling to halt this illegal activity. Second, another CPD detective, Daniel Hourihan, testified that five days after Fairley's arrest in this case, on September 22, 2020, Fairley committed another criminal offense. And as part of his guilty plea for the September 22 offense, Fairley admitted that he had used a "dangerous weapon." (Trial Tr., R. 59, PageID 481, 486). The court allowed the testimony about both incidents to show that Fairley had ready access to firearms and cocaine, and to show his intent, knowledge, and lack of mistake.

Fairley does not contest the factual accuracy of either law-enforcement officer's testimony that he committed these other bad acts. So, the first prong of our tri-partite test is not at issue. He does, however, dispute that they were admitted for a proper purpose and claims unfair prejudice. We therefore turn to the second and third prongs as they relate to each tranche of evidence.

*Prior Drug Trafficking and Firearms Possession.* Fairley's statements to Kopchak about his previous drug trafficking and firearms possession were admissible for Rule 404(b) purposes. At trial, the government had to show not only that Fairley possessed the crack seized from the BMW, but also that he intended to distribute it. Evidence tending to show that Fairley had one or more established sources for crack distribution in the months leading up to his Little-Eagle-parking lot arrest is useful to show both opportunity and intent to distribute.

Moreover, given the span of months rather than years between (1) Fairley's admission about having specific sources for both cocaine and firearms and (2) his arrest for possessing crack (with the intent to distribute) and two semi-automatic pistols, the jury could reasonably infer that Fairley had ready access and intent to possess these items. This evidence also rebuts Fairley's argument that someone else rather than he possessed these items. And Fairley's vague reference to the "prejudicial effect" of this evidence is woefully inadequate to establish that any such prejudice was undue in relation to the probative value of the evidence. (ECF 43, Appellant Br. at 36). To the contrary, evidence of Fairley's drug and gun sources as well as his affirmation

to officers that he had no desire to stop his activities carries considerable probative value in the face of Fairley's denials at trial.[4]

*Evidence of Post-Offense Criminal Conduct.* The admissibility of Hourihan's testimony about Fairley's possession of a dangerous weapon five days after the Little Eagle incident is a closer question. To determine whether evidence of other bad acts is probative of motive, knowledge, or intent under Rule 404(b) we assess whether "the evidence relates to conduct that is substantially similar and reasonably near in time to the specific intent offense at issue." *United States v. Barnes*, 822 F.3d 914, 922 (6th Cir. 2016) (citation and internal quotation marks omitted). Fairley's September 2020 crime comfortably meets the temporal aspect of our inquiry; it was mere days later. But the question of substantial similarity is somewhat complicated by the ambiguous way the information was presented to the jury. To be considered substantially similar, other bad acts "need not duplicate exactly the instant charge." *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988). Rather, the other bad act "need only be sufficiently analogous to support an inference of criminal intent." *Id.*

Here, Fairley's charges included being a convicted felon in possession of a firearm and possessing a firearm during and in relation to a drug trafficking offense. To avoid introducing unduly prejudicial evidence, Hourihan merely testified that Fairley pleaded guilty to a crime that included possessing a "dangerous weapon." (Trial Tr., R. 59, PageID 486).

Even if the government's evidence of Fairley's guilty plea to an unnamed crime that included possession of a dangerous weapon did not satisfy Rule 404(b)'s criteria, any error in admitting this evidence was harmless and does not entitle Fairley to a new trial. "Admission of other acts evidence constitutes harmless error if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *LaVictor*, 848 F.3d at 448 (citation and internal quotation marks omitted). All things considered, the government presented the jury with considerable evidence that Fairley possessed the firearms

---

[4]The government also asserts that Fairley's interview with Kopchak is admissible for non-Rule 404 purposes, as direct evidence of Fairley's guilt. We need not reach this alternative argument because we reject Fairley's claim on appeal that the evidence does not meet Rule 404(b) criteria.

even without the other acts evidence, and we are unconvinced that Fairley's conviction was swayed in any meaningful way by the admission of this evidence.

## C. Other Evidence—Fairley's Instagram Images

Federal Rule of Evidence 403 requires the court to consider whether the probative value of a particular item of otherwise relevant evidence is outweighed by, as relevant here, the danger of unfair prejudice. Fairley argues that is the case regarding an Instagram image the district court admitted. Both parties agree that we review evidentiary rulings under Rule 403 for abuse of discretion. *See United States v. Smith*, 70 F.4th 348, 352 (6th Cir. 2023).

During trial, Fairley objected to the admission of two images recovered from his Instagram account. One image, from August 2020, depicted Fairley with a large amount of cash. The other image, from September 2020, displayed only the cash—no Fairley. The district court expressed reservations about admitting the September 2020, cash-only image because it did not tie Fairley to the money. So, the government withdrew that image and moved forward with the August 2020 image. The government offered the August image to corroborate witness accounts of Fairley's drug dealing.

Any error that resulted from introducing the August 2020 image was harmless. As discussed in Part II, *supra*, extensive evidence presented at trial supported that Fairley had possession of the guns and cocaine base. Therefore, it is not "more probable than not that [any] error materially affected the verdict." *LaVictor*, 848 F.3d at 448 (citation and internal quotation marks omitted).

The district court did not cause any non-harmless error in its evidentiary rulings. Therefore, the cumulative effect of those rulings does not warrant reversal.

## V.     PROSECUTORIAL MISCONDUCT/DUE PROCESS

Fairley's final set of challenges pertain to the communications of the prosecuting Assistant U.S. Attorney ("AUSA") with a witness and statements made to the jury during closing argument. With respect to the former, Fairley claims that the AUSA engaged in witness

intimidation. And with respect to the latter, he claims prosecutorial misconduct warranting reversal. Reversal is not warranted.

A. Witness Intimidation

We apply plain error review to Fairley's unpreserved witness intimidation claim. *United States v. Meda*, 812 F.3d 502, 517 (6th Cir. 2015). We are thus tasked with determining whether there was "(1) an error, (2) that was obvious or clear, (3) that affected [Fairley's] substantial rights, and (4) that affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bauer*, 82 F.4th 522, 530 (6th Cir. 2023) (citing *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).

State authorities prosecuted Wilson in juvenile court for his conduct in the Little Eagle parking lot on the day Fairley was arrested. Fairley intended to call Wilson as a witness at his trial but aborted the effort after Wilson's *voir dire* examination by the court and the prosecution. On appeal, Fairley argues that the AUSA improperly threatened Wilson and went beyond neutral warnings in discussing with him his decision about whether to testify at Fairley's trial. Fairley points us to *United States v. Morrison* for support of this proposition. 535 F.2d 223, 226–27 (3rd Cir. 1976) (holding that defendant was deprived of due process when juvenile witness—a former codefendant and alleged coconspirator—refused to answer certain questions after receiving warnings from a prosecutor that she could be charged in state court juvenile proceedings or possibly in federal court for admitting she participated in the defendant's crimes). Fairley also argues that the AUSA's representation that Wilson might expose himself to federal prosecution and face a five-year minimum sentence was a "sham" and that the government's success in keeping a defense witness from testifying is prejudicial when the expected testimony would have absolved the defendant of any guilt. (ECF 43, Appellant Br. at 40–43).

"To establish a claim of witness intimidation, a defendant must present government conduct which amounts to substantial interference with a witness'[s] free and unhampered determination to testify and must prove that any inappropriate conduct was not harmless." *Meda*, 812 F.3d at 517 (internal quotation marks omitted) (quoting *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007)). Criminal defendants have the right to call witnesses to

testify without intimidation from the government. *See Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004) ("[F]ew rights are more fundamental than that of an accused to present a witness in his own defense."). But this right is not absolute. *Id.* Witnesses also enjoy their own constitutional right not to self-incriminate. And prosecutors have an ethical obligation to inform witnesses whenever the government knows or has a reason to believe that the witness could be subject to criminal prosecution. *Meda*, 812 F.3d at 517.

During Wilson's *voir dire* examination, the AUSA and the district court questioned Wilson about his decision to testify at Fairley's trial. During this examination, the district court confirmed that Wilson intended to testify about his and Fairley's involvement in the September 17, 2020, incident. The district court informed Wilson that if he testified "to certain matters, to include possession of the two guns, . . . as well as the crack cocaine in [the BMW], . . . [he] could face federal charges associated with" his confessed crimes. (Trial Tr., R. 60, PageID 635–36). The district court also asked whether Wilson wanted a lawyer before testifying, which Wilson declined.

The court then permitted the AUSA to address Wilson directly. The AUSA reiterated the court's warning that Wilson could be subject to additional prosecution because of his testimony and added that the charges could include an offense that carries a five-year mandatory minimum sentence. The AUSA then asked if Wilson was still willing to go forward without an attorney. Wilson responded, "I don't really understand." (*Id.* at 637).

> The court stepped back in, telling Wilson:
>
> THE COURT: [W]hat you're being advised is that if you testify, we anticipate that you may, but are not sure, but if you would testify that both the Glock and the Ruger that were found in the vehicle, the gold BMW X5 that you were in with apparently your sister who just testified, Ms. Stevens, that if you were in that vehicle and the drugs and the guns that were found by investigators in that vehicle, if you testify they are yours, you could face federal charges associated with that statement under oath. Do you understand that?
>
> THE WITNESS: Yes.

(*Id.* at 638). The court reiterated that the penalty could potentially include a mandatory minimum sentence of five years. Then, the court asked Wilson if it made sense for him to have a

lawyer since he had "not had the opportunity to consult with counsel to advise [him] as to whether or not [he] should so testify." (*Id*. at 639–40). Wilson agreed. And the district court arranged for him to meet with a federal public defender and put the proceedings on hold until he did so. After a recess lasting just over an hour, the defense rested its case without calling Wilson to the stand.

Neither the district court's nor the AUSA's conduct rose to the level of substantially interfering with Wilson's decision to testify or Fairley's right to call a witness on his own behalf. The court accurately advised Wilson that his testimony could have unwanted and unconsidered legal consequences, including the possibility of new federal charges. The AUSA asked Wilson two substantive questions—confirming that he understood there were potential legal risks associated with his testimony and confirming that he still wanted to proceed without a lawyer. When Wilson indicated that he did not understand, the trial court arranged for Wilson to confer with counsel. This warning appears neutral. And the two substantive questions from the AUSA did not substantially interfere with Fairley's right to present witness testimony in his defense; instead they were aimed at ensuring that Wilson understood the charges he faced, consistent with the prosecutor's ethical obligation. *Meda*, 812 F.3d at 517. Indeed, Wilson never refused to testify. Fairley was still free to call Wilson to the stand after he had the opportunity to consult with counsel but apparently chose not to do so.

Nor do we have a sufficient basis to conclude that the AUSA's warning to Wilson was a "sham." Fairley argues that because the Federal Juvenile Delinquency Act ("FJDA") requires a United States Attorney to make certain certifications before prosecuting a juvenile in federal court, it is unlikely that Wilson would be a candidate for federal prosecution. And to subject Wilson to the five-year mandatory minimum sentence referenced, the government would additionally have to succeed in a motion to transfer Wilson over for adult prosecution on the offense, another unlikely scenario. But Fairley seems to concede that the FJDA may provide some instances in which a juvenile defendant can later be criminally prosecuted in federal court, and it is not impossible that Wilson could have been bound over for adult prosecution on charges for his conduct in the Little Eagle parking lot on September 17, 2020. In any event, it is unclear whether Wilson would have faced additional criminal prosecution if he took the blame for all the

contraband in the BMW, but he potentially could have.  The district court properly determined that Wilson should have an opportunity to discuss such questions of legal exposure with counsel.

Fairley's reliance on *Morrison* is unpersuasive.  The government's actions in *Morrison* were much more severe and threatening.  There, outside the presence of the court, the government's attorney made multiple threats of prosecution to a witness over the course of several days.  *Morrison*, 535 F.2d at 225.  When the initial threats did not deter the witness from testifying, the attorney issued an apparently bogus subpoena and called the witness into government offices for an interview, where she was confronted by the prosecutor and several undercover agents from the case whose testimony the witness was being called to undermine.  *Id.* at 225–26.  Contrastingly, here, the court and government counsel briefly advised and queried Wilson.  Such relatively perfunctory questioning from the trial court and prosecution in open court, with defense counsel present, does not approach the type of conduct identified in *Morrison*.  Accordingly, we see no error with this aspect of Fairley's proceedings.

## B.  Closing Remarks

Fairley raises two issues relating to closing arguments.  First, he argues that the AUSA committed prosecutorial misconduct in stating that Wilson pleaded guilty to "trafficking," in juvenile court, and forfeited a Ruger.  Fairley argues that reference to Wilson's juvenile court adjudication was improper because it amounted to using the conviction of an alleged accomplice as substantive evidence of Fairley's guilt in possessing the Glock.  Second, in responding to this aspect of the government's closing, Fairley's counsel made a statement about Wilson's potential plea deal in juvenile court.  The government objected that the statement was not supported by evidence presented at trial, and the district court sustained the objection.  Fairley argues that the AUSA's misconduct and the court's decision upholding the government's objection to Fairley's attempt to correct the record resulted in reversible error.

*The Government's Closing Remarks*. Because Fairley never objected to the government's closing remarks, we again employ plain error review.  *United States v. Jones*, 55 F.4th 496, 502 (6th Cir. 2022).  With respect to the third prong of the plain-error analysis—effect on a defendant's substantial rights—"[w]e determine whether prosecutorial misconduct affected

a defendant's substantial rights by evaluating the four flagrancy factors" included in the court's "two-step test [for] evaluating a claim of prosecutorial misconduct." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). Under this approach, we first consider the threshold question of whether the AUSA's conduct and remarks were improper. *Id.* If they were, we then turn to flagrancy and ask (1) whether the conduct and remarks tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

Importantly, we assess the alleged improper conduct "within the context of the trial as a whole." *Id.* (citation and internal quotation marks omitted). During opening statements, Fairley's counsel stated that "Wilson was charged with possessing the very same drugs and guns" that formed the basis for Fairley's charges. (Trial Tr., R. 59, PageID 341). In context, this statement was an apparent attempt to lay the groundwork for Fairley's defense theory that Wilson, rather than he, possessed both firearms. The AUSA wrongly believed that Fairley's counsel had stated during his opening statement that "Wilson took responsibility for all of the guns." (Trial Tr., R. 59, PageID 493). So during trial, the AUSA introduced Exhibit 310, a judgment entry showing that Wilson admitted to a drug trafficking offense[5] and forfeited only the Ruger found in the BMW. Though the AUSA's understanding about what defense counsel said during opening was inaccurate, it was verified as correct by defense counsel during a sidebar discussion regarding a different objection to Hourihan's testimony about Exhibit 310. And the district court ultimately admitted the docket entry into evidence with agreement from both sides.

Then later, during closing arguments, the AUSA again referred to Wilson's juvenile adjudication, this time airing his misunderstanding of Fairley's opening statement directly to the jury. As relevant here, the AUSA stated:

> I do have to comment on the earlier statement that Terrez Wilson took responsibility for the guns. . . . [I]t's not what the evidence here showed. You were introduced to Government's Exhibit 310, and you'll have that back with you, it's a[n] order from the juvenile court. Terrez Wilson . . . pleaded guilty in

---

[5]This formal admission of responsibility in the juvenile court appears to be the functional equivalent of pleading guilty in adult proceedings.

this case. And I hope what you do is take this and read it. And what you'll see it Terrez Wilson . . . had forfeited a Ruger. A Ruger. Could have jointly possessed it. But he forfeited a Ruger. What you will not see on here is a Glock. The exact kind of weapon that the defendant raps about, tells you about, his weapon of choice, a Glock.

(Trial Tr., R. 61, PageID 836–37). Fairley did not object to the misstatement or the invocation of Wilson's juvenile adjudication but attempted to clarify the record during his own closing remarks.

Fairley first asserts that the AUSA's statement mischaracterizing defense counsel's opening remarks about Wilson being charged for the same guns for which Fairley is now being prosecuted was improper. And relying on *Bisaccia v. Attorney General* , 623 F.2d 307 (3rd Cir. 1980) and *Kirby v. United States*, 174 U.S. 47 (1899), Fairley argues that the AUSA used Wilson's juvenile adjudication as substantive evidence of Fairley's guilt. Neither the misstatement nor the use of Wilson's juvenile adjudication rises to the level of prosecutorial misconduct.

*Propriety of the Government's Remarks.* Closing remarks can be improper if the government implies facts or opinions not supported by evidence or the nature of the statement is otherwise forbidden by substantive or procedural rules. *See Slagle v. Bagley*, 457 F.3d 501, 518 (6th Cir. 2006). In terms of forbidden uses, it is well established that "the guilty plea or conviction of a co-defendant or co-conspirator . . . [is] never admissible as substantive evidence of the defendant's guilt." *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996) (citing *United States v. Blandford*, 33 F.3d 685, 709 (6th Cir. 1994)). And even "a legitimate introduction of a plea may rise to the level of prejudicial error if the prosecutor suggests in closing argument that the jury use the plea for a prohibited purpose." *United States v. Benson*, 591 F.3d 491, 499 (6th Cir. 2010).

That said, the government may offer such evidence when the defense "invite[s]" the subject by attempting to "shift culpability" from the defendant to a co-defendant or co-conspirator during the trial. *United States v. DeLoach*, 34 F.3d 1001, 1004 (11th Cir. 1994); *see also United States v. Busch*, No. 20-4065, 2021 WL 5133178, at *13 (6th Cir. Nov. 4, 2021) (affirming the district court's decision to allow evidence of a co-conspirator's guilt where the

defense's entire theory was predicated on shifting blame from the defendant to a co-conspirator). And remarks do not ordinarily rise to the level of impropriety when they respond to the defense's theory of the case. *See United States v. Barnett*, 398 F.3d 516, 523 (6th Cir. 2005).

Fairley's guilt-shifting theory of the case invited the government's remarks during closing. Indeed, Fairley concedes that his "entire defense was premised on a contention that another occupant of the vehicle (most likely [Wilson]) was the sole possessor of the crack cocaine and firearms." (ECF 43, Appellant Br. at 12). And though the AUSA inaccurately recounted defense counsel's words from his opening statement, defense counsel's affirmation of the statement at sidebar and Fairley's blame-shifting theory undercut any suggestion that the misstatement was purposeful or otherwise made for an improper purpose.

Even so, the latter portion of the remarks potentially went too far. That is, by stating that the Glock was "[t]he exact kind of weapon that the defendant raps about," the government may have gone beyond rebutting Fairley's claim that the guns belonged to Wilson and invited the jury to consider Wilson's forfeiture of the Ruger as substantive evidence that Fairley owned the Glock. (Trial Tr., R. 61, PageID 837). Any such invitation would have been improper.

Even if any of the referenced closing remarks were improper, Fairley's misconduct claim fails on the flagrancy inquiry. First, the remarks could not have misled the jurors in their understanding of Fairley's overall blame-shifting theory of the case. This theory presumably explains Fairley's agreement (subject to the court's approval) to the admission of Exhibit 310 to begin with. Nor could the jury have been misled to believe that Wilson's guilt proved Fairley's guilt. After all, the jurors heard testimony about both Fairley's and Wilson's individual activities leading up to Fairley's arrest. And the district court instructed them that "whether anyone else … has been prosecuted and convicted for these crimes is not a proper matter for you to consider," and that they could not let "the possible guilt of others influence [their] decision in any way." (Trial Tr. 61, PageID 790). Further, the remarks about the juvenile adjudication were brief and isolated at the end of a four-day trial. And the evidence otherwise presented to the jury was strong. A stray inaccurate comment from the government generally will not support reversing a conviction where the evidence was strong enough that the comment likely did not impact the outcome of the trial. *See Carson*, 560 F.3d at 577. We find no plain error.

*The Government's Objection to Fairley's Closing.*  Next, we consider Fairley's claim of improper interference in his attorney's closing argument, which we review for abuse of discretion.  *See United States v. Hynes*, 467 F.3d 951, 957 (6th Cir. 2006).

The trial court did not abuse its discretion in sustaining the government's objection to defense counsel's closing.  Fairley contends he was prevented from refuting the government's argument that Wilson had taken responsibility for only one gun after the trial court interfered with defense counsel's closing.  The record says otherwise.  Defense counsel was able to refute the prosecution's closing remarks on this point.  During closing, Fairley's attorney stated, in relevant part:

> There's an exhibit marked 310.  It's the journal entry related to Terrez Wilson's conviction in juvenile court.  You'll remember this.  And the Government has posed to you that this clearly, clearly shows that Mr. Wilson . . . had only taken responsibility for the Ruger in the car . . . .  Please read the whole paragraph of the journal entry.  This is kind of important.  Out of five counts, Counts 1, 2, and 3 were dismissed.  We have absolutely no way of knowing which guns were dismissed versus which ones Terrez took responsibility for in juvenile court.

(Trial Tr., R. 61, PageID 851).  The government did not object to this portion of defense counsel's closing.  Rather, it objected to the next statement when defense counsel opined about *why* counts 1, 2, and 3 were dismissed.  Specifically, defense counsel asserted, "[w]hat we do know is that three counts were dismissed as part of a plea arrangement.  That would have been helpful."  (*Id.*)

Neither party presented evidence of Wilson's plea agreement in juvenile court—only the judgement entry.  Thus, the district court properly sustained the government's objection to Fairley's closing remarks referring to facts not in evidence.  *See United States v. Davis*, 809 F.2d 1194, 1209 (6th Cir. 1987) (affirming a trial court's limitation of defense counsel's closing argument when the closing relied on facts not in evidence).  Taken together, neither of Fairley's complaints relating to the closing remarks amount to reversible plain error or abuse of discretion.  Accordingly, these arguments fail.

## VI.    CONCLUSION

For the foregoing reasons, we **AFFIRM**.